1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         EASTERN DISTRICT OF CALIFORNIA

10

                                   ----oo0oo----

11

12   MARJORIE C. PINO,
     individually, and as a
13   representative of the estate
     of decedent RONNIE PINO,
14                                            NO. CIV. S-05-2080 WBS DAD

             Plaintiff,
15
          v.
16                                            ORDER RE: MOTIONS FOR SUMMARY
     CITY OF SACRAMENTO, SACRAMENTO           JUDGMENT
17   COUNTY, ALBERT NARJERA, LOU
     BLANAS, PSYCHIATRIC SOLUTIONS,
18   INC., and DOES 1 through 75,
     inclusive,
19
             Defendants.
20

21                                 ----oo0oo----

22          Plaintiff Marjorie C. Pino, individually and as a

23   representative of her late son Ronnie Pino's estate, alleges

24   seven causes of action, principally under 42 U.S.C. § 1983,

25   against defendants City of Sacramento, Sacramento County, Police

26   Chief Albert Najera, County Sheriff Lou Blanas, and Psychiatric

27   Solutions, Inc., d/b/a Heritage Oaks Hospital ("Heritage Oaks").

28   Now before the court are three separate motions for summary

                                        1

1 judgment filed by defendants City of Sacramento and Albert Najera

2 ("City defendants"), County of Sacramento and Lou Blanas ("County

3 defendants"), and Heritage Oaks.

4 I.   Factual and Procedural Background

5        This action arises out of the death of Ronnie Pino

6 ("decedent" or "Ronnie") on the morning of December 23, 2004.

7 Ronnie was a thirty-one year old mentally-disabled man who

8 suffered from seizures, epilepsy, auditory and visual

9 hallucinations, and various other ailments stemming from the

10 removal of a brain tumor when he was fifteen years old.  (Pl.'s

11 Statement of Undisputed Facts #4, 5, 8.)  Decedent also had

12 difficulty hearing.  (Id. #29.)  In an effort to control his

13 seizure disorder, Ronnie regularly took various medications, and

14 had a nerve stimulator implanted in his body in 2003.  (Id. #8,

15 9.)  While the medications were relatively successful in

16 controlling the seizures, they appeared to exacerbate his

17 hallucinations.  (Id. #9.)

18     A.   Heritage Oaks Hospital Incident

19        On December 22, 2004, decedent's mother, the plaintiff

20 in this action, and various other family members took Ronnie to

21 Heritage Oaks Hospital, a psychiatric facility, to seek treatment

22 for his hallucinations.  (Compl. ¶ 11.)  Upon arrival at the

23 hospital, plaintiff met with Marsha Koopman, R.N., in order for

24 Ronnie to undergo an assessment prior to admittance to the

25 hospital.[1]  (Heritage Oaks' Statement of Undisputed Facts #4.)

26

27        [1]   Standard practice at Heritage Oaks entailed a
preliminary assessment, by "assessment and referral clinicians"
28 such as Ms. Koopman.  This assessment was then to be presented to

1  Decedent was briefly in the assessment room during the interview,
2  but wandered in and out, and around the waiting area, while
3  plaintiff responded to Ms. Koopman's questions.  (Id. #7-11.)
4  Throughout the assessment, decedent repeatedly asked to go outside
5  to smoke a cigarette.  (Id. #12.)  The front door of Heritage Oaks
6  Hospital remains locked at all times, and Ms. Koopman told
7  decedent that he could only go outside once they finished with the
8  questions.  (Id. #13-14.)

9       Prior to completing the assessment, however, decedent
10 advised Heritage Oaks employees that if he were not allowed out,
11 he would break the window in order to get outside to smoke.
12 (Pl.'s Statement of Undisputed Facts #35.)  As hospital employees
13 approached the waiting area where decedent was located, he kicked
14 out the glass entrance door and dove outside.  (Id. #37.)  In
15 response, hospital employees called the police to report the
16 incident.  (Heritage Oaks' Statement of Undisputed Facts #22.)
17 Hospital employees then went outside to clean up the glass, and
18 see if decedent sustained any injuries requiring immediate medical
19 attention.  (Id. #19.)

20     B.   City of Sacramento Police

21       In response to the call, Sacramento Police Officers
22 Sherry Bell and Douglas Nguyen were dispatched to the scene.
23 (City Defs.' Statement of Undisputed Facts #40.)  Upon arrival,
24 decedent was standing in front of the broken window, smoking a
25 cigarette while bleeding from the arm and leg.  (Id. #42, 43.)
26 Officer Bell was informed by a Heritage Oaks employee of a prior

27 ──────────────

28 a psychiatrist, who would make the decision to admit the patient
   to the hospital or not.  (Id. #4, 5.)

3

1  incident involving decedent at Sutter General Hospital, where ten

2  people were required to restrain him after he become violent.[2]

3  (Id. #41.)

4          After attempting to communicate with decedent, and

5  finding him non-responsive, the officers requested back-up.  (Id.

6  #45-46.)  Among the officers to respond was Officer Paul Fong, who

7  activated his in-car camera upon receiving the call.  (Id. #49;

8  Paul Fong Decl. Ex. A ("Videotape").)  Upon Fong's arrival,

9  decedent indicated that the lights on top of the patrol car were

10  bothering him, so Officer Fong returned to his car and turned them

11  off.  (Videotape.)  Officer Fong then repeatedly, calmly, and

12  politely asked decedent if they could place him in handcuffs, so

13  that he could get medical attention for his injuries.  (Id.)  When

14  Officer Fong displayed his handcuffs to decedent, decedent tried

15  to take them out of Fong's hands.  (Id.)  Decedent then resisted

16  the efforts of the officers to handcuff him, and punched Officer

17  Fong in the face.  (Id.)  At this point, Officer Bell discharged

18  her taser at decedent.  (Id.)  Decedent remained standing and

19  pulled one of the taser darts out, although he eventually got down

20  onto his hands and knees.  (Id.)  However, decedent failed to get

21  down onto his stomach as the officers were demanding, at which

22  point Officer Bell cycled her taser for an additional five

23  seconds.  (Id.)  Decedent then went down onto his stomach and was

24  handcuffed.  (Id.)

25          Paramedics were then allowed to treat decedent, and

26

27          [2]    This indecent was communicated to Heritage Oaks
   employees by plaintiff prior to the police officers' arrival.
28  (Heritage Oaks' Statement of Undisputed Facts #24.)

4

1   subsequent to treatment, he was transferred to the Sacramento
2   County Jail.  (City Defs.' Statement of Undisputed Facts #68.)
3   While in route to the jail, Officers' Bell and Nguyen received a
4   list of decedent's medications, which they provided to the booking
5   nurse at the jail upon arrival.  (Id. #68, 69.)  There is no
6   evidence that the officers, the City, or the County received the
7   medications or the prescriptions themselves.

8          C.   County of Sacramento Jail

9          Upon arrival at Sacramento County Jail, decedent was
10  medically screened by Hank Carl, R.N.  (County Defs.' Statement of
11  Undisputed Facts #7, 8.)  Mr. Carl received decedent's list of
12  medications,[3] took his blood pressure, assessed his breathing and
13  pulse, and treated his wounds.  (Id. #9-15, 21, 26-27.)  Mr. Carl
14  determined that decedent's vital signs were all within normal
15  limits, and thus hospitalization was not required.  (Id. #58-59.)
16  Mr. Carl also attempted to determine medical history, but decedent
17  was generally uncommunicative and a poor historian.  (Id. #18,
18  20.)

19         Mr. Carl concluded that a "jail psychiatric services"
20  ("JPS") referral was required, pursuant to a jail policy that any
21  patient who had been using psychiatric medications and/or had an
22  active mental illness warranted such a referral.  (Id. #38-40.)
23  Mr. Carl was also aware of the common practice at the jail to
24  refer a Benzodiazepine user to the medical floor as soon as

25

26

27         [3]    Decedent was noted as taking: Clonazepam, Paxil,
    Depakote, Haldol, Risperdal, Protonix, Lactulose, Keppra, and
28  Diltiazem.

1 possible, for potential Benzodiazepine withdrawal,[4] and thus

2 indicated on the medical referral that "detox" might be a

3 consideration due to Benzodiazepine use.  (Id. #37, 47, 65, 66.)

4        Decedent was then evaluated by Dan Clark, Senior

5 Psychiatric Technician, who interviewed him and placed him on a

6 seventy-two hour hold pursuant to Welfare and Institutions Code §

7 5150, because he was having trouble following custody directions

8 and could not function in the general population.[5]  (Id. #69-73.)

9 As part of the admissions process to the in-patient unit, Mr.

10 Clark took decedent's vital signs, and noted no abnormalities.

11 (Id. #74.)

12        Decedent was placed in a psychiatric cell, equipped with

13 a window that allows for observation of the patients through the

14 door.  (Id. #75.)  Pursuant to departmental policy, regular

15 observations were made of decedent at thirty-minute intervals.

16 (Id. #76.)  It was noted that decedent slept until 5:00am, ate

17 most of his breakfast, and then slept again until 7:00am.  (Id.

18 #77-81.)  Later that morning, at approximately 9:00am, Dr. Cameron

19 Quanbeck entered decedent's cell as part of his regular morning

20 rounds, but determined that decedent was just rousing from sleep,

21 and thus indicated that he would return shortly to conduct a full

22

23        [4]    Clonazepam is a Benzodiazepine.

24        [5]    "When any person, as a result of mental disorder, is a
danger to others, or to himself or herself, or gravely disabled,
25 a peace officer, member of the attending staff, as defined by
regulation, of an evaluation facility designated by the county,
26 . . . may, upon probable cause, take, or cause to be taken, the
person into custody and place him or her in a facility designated
27 by the county and approved by the State Department of Mental
Health as a facility for 72-hour treatment and evaluation."  Cal.
28 Welfare & Inst. Code § 5150.  The Sacramento County Jail is such
a facility.

1  evaluation.  (Id. #90.)[6]

2        During rounds, and before Dr. Quanbeck returned to
3  decedent's cell, he was informed by the staff that decedent's
4  mother had telephoned to inform them of decedent's history of
5  seizure disorder.  (Id. #95-96.)  Accordingly, at approximately
6  9:30am, Dr. Quanbeck ordered that decedent be placed on video
7  camera observation, which allowed staff members to monitor
8  patients in cells.  (Id. #98-101.)

9        Sometime between 9:35 a.m. and 9:45 a.m., staff members
10 saw decedent lying across his bed at an unusual angle.  (Id.
11 #133.)  Several staff members entered decedent's cell, and noted a
12 very weak pulse, and no signs of respiration.  (Id. #140-143.)
13 The staff members then proceeded to administer CPR.  (Id. #144.)
14 At 10:02am, emergency medical personnel arrived and took over CPR,
15 but after fifteen minutes the fire captain determined that Mr.
16 Pino had died, and nothing more could be done.  (Id. #167.)

17       On October 13, 2005, plaintiff filed a complaint against
18 the named defendants, arguing that decedent's death was a result
19 of improper medical care, improper training, excessive force, and
20 deliberate indifference to decedent's special needs.  (Compl. ¶¶
21 20-27.)  Plaintiff's original complaint, filed on October 14,
22 2005, alleges five causes of actions under 42 U.S.C. § 1983 and a
23 deliberate indifference action against defendants City of
24 Sacramento, Sacramento County, Albert Najera (individually and in
25 his capacity as Chief of Police of the City of Sacramento), Lou

26

27       [6]   It is standard policy within the JPS that each patient
   admitted to the in-patient unit be evaluated by a psychiatrist
28 within 24 hours of admission. (Id. #91.)

                               7

1 Blanas (individually and in his capacity as Sacramento County
2 Sheriff).  Plaintiff alleges a single cause of action against
3 defendant Heritage Oaks for negligence, negligent training, and
4 negligent supervision.

5 　　　　Notably, on November 7, 2006, plaintiff moved to amend
6 her complaint by adding three additional defendants, adding an
7 intentional tort cause of action against PSI and augmenting the
8 facts of her complaint throughout.  (Pl.'s Mot. to Amend.)  On
9 December 13, 2006, this court denied the motion, based on
10 plaintiff's failure to show good cause why such an amendment
11 should be allowed.  (Dec. 13, 2006 Order.)  Each of the defendants
12 (City defendants, County defendants, and Heritage Oaks) now brings
13 a motion for summary judgment.

14 II.  Discussion

15 　　　A.  Legal Standard

16 　　　　Summary judgment is proper "if the pleadings,
17 depositions, answers to interrogatories, and admissions on file,
18 together with the affidavits, if any, show that there is no
19 genuine issue as to any material fact and that the moving party is
20 entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).
21 A material fact is one that could affect the outcome of the suit,
22 and a genuine issue is one that could permit a reasonable jury to
23 enter a verdict in the non-moving party's favor.  Anderson v.
24 Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving
25 for summary judgment bears the initial burden of establishing the
26 absence of a genuine issue of material fact and can satisfy this
27 burden by presenting evidence that negates an essential element of
28 the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S.

8

1  317, 322-23 (1986).  Alternatively, the movant can demonstrate

2  that the non-moving party cannot provide evidence to support an

3  essential element upon which it will bear the burden of proof at

4  trial.  Id.

5       Once the moving party meets its initial burden, the non-

6  moving party must "go beyond the pleadings and by her own

7  affidavits, or by 'the depositions, answers to interrogatories,

8  and admissions on file,' [and] designate 'specific facts showing

9  that there is a genuine issue for trial.'"  Id. at 324 (quoting

10 Fed. R. Civ. P. 56(e)).  The non-movant "may not rest upon the

11 mere allegations or denials of the adverse party's pleading."

12 Fed. R. Civ. P. 56(e); Valandingham v. Bojorquez, 866 F.2d 1135,

13 1137 (9th Cir. 1989).  However, any inferences drawn from the

14 underlying facts must be viewed in the light most favorable to the

15 party opposing the motion.  Matsushita Elec. Indus. Co., Ltd. v.

16 Zenith Radio Corp., 475 U.S. 574, 587 (1986).

17      B.   Heritage Oaks' Motion

18      Heritage Oaks seeks summary judgment on the seventh

19 cause of action, the sole claim brought against them, which

20 alleges "negligence, negligent training, and negligent

21 supervision."  (Heritage Oaks' Mot. for Summ. J. 6.)  To prove a

22 case of negligence, plaintiff must show that Heritage Oaks owed "a

23 duty of care, which they breached by conduct falling below a

24 defined standard of care, plus causation and damages."  Hernandez

25 v. KWPH Enters., 116 Cal. App. 4th 170, 175 (2004) (citing Wright

26 v. City of Los Angeles 219 Cal. App. 3d 318, 344-345 (1990)).

27      "The existence of a duty of care is a question of law to

28 be determined by the court alone."  Id. at 176-177 (citing

9

1  Tarasoff v. Regents of Univ. of Cal., 17 Cal.3d 425, 434 (1976)).

2  "Under traditional tort law principles, one is ordinarily not

3  liable for the actions of another and is under no duty to protect

4  another from harm, in the absence of a special relationship of

5  custody or control." Nally v. Grace Cmty. Church, 47 Cal.3d 278,

6  293 (1988)).  Heritage Oaks contends that there was no special

7  relationship because they were "not treating or providing

8  psychiatric care to decedent." (Heritage Oaks' Mot. for Summ. J.

9  8.)  However, Heritage Oaks also admits that, despite decedent's

10 repeated requests to leave the facility, they would not unlock the

11 door or allow him to leave. (Heritage Oaks' Statement of

12 Undisputed Facts #13-14.)  Regardless of whether decedent had yet

13 to be admitted as a patient, once Heritage Oaks endeavored to

14 exercise control over him in this manner, they created a

15 sufficient relationship between themselves and decedent so as to

16 create a duty, obligating them to act with due care.  Nally, 47

17 Cal.3d at 293.

18     By contrast, the question of whether a duty has been

19 breached is normally a question of fact.  Hernandez, 116 Cal. App.

20 4th at 175.[7]  However, while breach is generally a question of

21 fact, "it is one of law if no reasonable jury may conclude based

22

23     [7]     Plaintiff asserts that it is not bringing a medical
   malpractice claim, but merely a "straight forward negligence
24 claim under general negligence law," and thus the legal standard
   of care regarding professional negligence is inapplicable.
25 (Pl.'s Opp'n to Heritage Oaks' Mot. for Summ. J. 8.)  For the
   purposes of this motion, however, "whether the cause of action is
26 denominated 'ordinary' or 'professional' negligence . . . is
   immaterial to resolving a motion for summary judgment."  Flowers
27 v. Torrance Mem'l Hosp. Med. Ctr., 8 Cal.4th 992, 1000 (1994);
   see also Cal. Civ. P. Code § 340.5.  It is sufficient to note
28 that, under either theory, defendants had a duty to act with due
   care.

1   upon the undisputed facts that liability exists." <u>Delfino v.</u>
2   <u>Agilent Techs., Inc.</u>, 145 Cal. App. 4th 790, 818 (2006); <u>Flowers</u>
3   <u>v. Torrance Mem'l Hosp. Med. Ctr.</u>, 8 Cal.4th 992, 1000 (1994)
4   ("[If] evidence as to the requisite due care is uncontroverted,
5   the trial court may properly address the question as a matter of
6   law and proceed to a consideration of the defendant's alleged
7   negligence.")  Under specific questioning by this court at oral
8   argument, plaintiff's counsel narrowed the scope of the negligence
9   claim against Heritage Oaks to two specific issues: 1) whether
10  Heritage Oaks breached their duty of due care by refusing to allow
11  decedent to leave the facility to smoke a cigarette; and 2)
12  whether Heritage Oaks breached their duty of due care by informing
13  the police that decedent was violent.

14              1.   <u>Refusing to Allow Decedent to Leave</u>

15              Defendant presents the expert testimony of Brad
16  Nicodemus, a registered nurse for over sixteen years, who has
17  worked in the field of psychiatric care for over twenty-two years.
18  Mr. Nicodemus notes that: 1) when decedent was brought to the
19  hospital by his family, he confessed a lack of a desire to be
20  there, which meant that he was being considered for an involuntary
21  hold; and 2) before completing an initial assessment, Heritage
22  Oaks knew very little about decedent and how unpredictable and/or
23  uncontrollable his behavior might be.  (Nicodemus Decl. ¶¶ 4, 5.)
24  Overall, after a review of the relevant assessment records,
25  Heritage Oaks' policies and procedures, as well as plaintiff's
26  complaint, Mr. Nicodemus concludes that Heritage Oaks acted
27  appropriately in refusing to allow decedent to leave the facility.
28  (<u>Id.</u>)

1    Plaintiff claims that Heritage Oaks was negligent
2  because they knowingly denied decedent a calming mechanism--but
3  this argument ignores the plain fact that when he was being
4  evaluated for a possible involuntary commitment, allowing him to
5  leave the premises would be akin to allowing him to escape.  An
6  involuntary hold is premised on the fact that a person might be a
7  danger to himself or others.  Cal. Welfare & Inst. Code § 5150.
8  Thus, if defendant had any sort of duty of care or control over
9  decedent (as plaintiff asserts they did), they could be liable for
10 any harm that occurred if they <u>did</u> let him go free.  <u>See</u>, <u>e.g.</u>,
11 <u>Bragg v. Valdez</u>, 111 Cal. App. 4th 421, 432 (2003) (holding that
12 defendants owed a duty to anyone injured by an involuntarily
13 committed person released for the wrong reasons).

14    More importantly, in response to the evidence provided
15 by Heritage Oaks regarding the standard of care, plaintiff offers
16 nothing more than an attempt to discredit Nicodemus' testimony as
17 that of an "interested layman."[8]  Plaintiff cannot merely rest
18 upon the bare denials of defendant's motion or the allegations of
19 negligence contained in the complaint.  Fed. R. Civ. P. 56(e).
20 Upon a motion for summary judgment by defendant, plaintiff is
21 required to come forward with evidence supporting her claims.  In
22 this case, plaintiff has failed to offer <u>any</u> such evidence to
23 demonstrate that a standard of care was breached, either by means
24 of affidavits, expert testimony, or even relevant analogous case-

25

26
_____

27    [8]    However, Nicodemus' declaration more than adequately
   establishes his credentials, and the mere fact that he was
28 employed at one time by Heritage Oaks does not invalidate his
   testimony regarding the proper standard of care.

12

1  law.[9]  Celotex, 477 U.S. at 323 (holding that a motion for summary

2  judgment should be granted, even if the movant provides no

3  affidavits or evidence, if the movant demonstrates to the court

4  that the "nonmoving party has failed to make a sufficient showing

5  on an essential element of her case with respect to which she has

6  the burden of proof"); Hutchinson v. U.S., 838 F.2d 390, 392 (9th

7  Cir. 1988) (citing Willard v. Hagemeister, 121 Cal. App. 3d 406,

8  412 (1981)) ("When a defendant moves for summary judgment and

9  supports his motion with expert declarations that his conduct fell

10 within the community standard of care, he is entitled to summary

11 judgment unless the plaintiff comes forward with conflicting

12 expert evidence.")  Accordingly, this court finds that no

13 reasonable jury could conclude that Heritage Oaks was negligent in

14 not allowing decedent to leave the building.

15

---

16      [9]   At oral argument, counsel for plaintiff suggested that
   there was an inside smoking area to which the Heritage Oaks
17 employees could easily have directed decedent rather than simply
   refusing his request to go outside.  It wasn't that simple,
18 however.  To the contrary, on page 29 of the deposition of Marsha
   Koopman, the intake nurse, she gave the following answers:
19
20      Q.  All right.  Is there a place to smoke a cigarette
   within the facility?

21      A.  Go through the cafeteria to an outside patio.

22      Q.  And how far away is that?

23      A.  Well, it's quite a distance, I'd say probably 100
   feet to the cafeteria.  And the distance of the cafeteria is
24 probably, I don't know, another 200 feet and then outside on the
   patio.
25
26      Q.  Okay.  Is there any reason why you didn't want to
   allow him to have a cigarette?

27      A.  No, I didn't - - there wasn't - - I just wanted to
28 talk to him and find out what was going on before we stopped the
   interview process.

2.   Informing Police Decedent Was Violent

Plaintiff also claims that Heritage Oaks acted negligently when they called the police and informed them that decedent was violent, thereby increasing the likelihood that the police would react aggressively towards him.[10]  In this case, however, Heritage Oaks employees simply reacted in a reasonable and predictable manner to a person smashing the window of their front door in order to exit the facility.  It is beyond dispute that such an action is violent in nature--Heritage Oaks employees merely described what had happened.  Plaintiff argues that Heritage Oaks employees, upon informing the police of decedent's violent actions, were also duty-bound to communicate additional information regarding decedent's mental and physical condition. However, it is undisputed that decedent's outburst occurred before Heritage Oaks was able to complete their intake assessment of him. No reasonable jury could conclude that telephoning the police to report such an incident was negligent.

Moreover, the videotape clearly reveals that the police officers, upon arriving at the scene, had ample time to assess the situation on their own, without relying upon the description given during the emergency call.  Indeed, it was not until decedent punched Officer Fong that Officer Bell fired her taser.  Thus, it

[10]   Plaintiff makes a point of the fact that the police report from the 911 call reported that the caller said decedent "would be" violent, as if that should be understood as a prediction rather than a description of past or present conduct. The court finds this to be no more than a semantic distinction. Whether the caller said that decedent "would be" violent, or whether the caller said that decedent "was" or "had been" violent, or whether the caller described decedent's conduct and the person preparing the report simply summarized it makes no difference in the court's analysis.

1  was not Heritage Oaks' description of decedent as violent that led

2  the police to react the way they did--it was decedent's violent

3  actions.  Accordingly, this court holds that no reasonable jury

4  could find Heritage Oaks negligent for calling the police and

5  informing them that decedent was violent.

6        With regard to plaintiff's claim of negligent training

7  and/or supervision, to "establish a negligent hiring claim,

8  plaintiff must show that the employer knew or should have known

9  the employee created a particular risk or hazard."  Evan F. v.

10 Hughson United Methodist Church, 8 Cal. App. 4th 828, 836-837

11 (1992).  As with the negligence claim above, plaintiff has failed

12 to present a single piece evidence indicating that Heritage Oaks

13 knew or should have known of any insufficiently qualified or

14 trained employee.  Plaintiff fails to articulate what policy or

15 procedures were inadequate, and even fails to indicate which

16 employees she believes were negligently trained and/or hired.

17 Moreover, this court had found that no reasonable jury could find

18 the challenged actions to be negligent.  Because plaintiff cannot

19 rest solely upon the broad and unsubstantiated allegations in her

20 complaint, Heritage Oaks' motion for summary judgment must be

21 granted.

22    C.    42 U.S.C. § 1983 Claims

23        Plaintiff's first, second, third, fifth, and sixth

24 causes of action, asserted against both the City defendants and

25 County defendants, all relate to alleged direct violations of

26 plaintiff's and decedent's constitutional rights under § 1983.

27 (Compl.)  Because these claims relate to conduct by City and

28 County employees, the only theory by which the City and County

15

1  could be directly liable is respondeat superior.[11]  However, the

2  Supreme Court has made it clear that "a municipality <u>cannot</u> be

3  held liable under § 1983 on a respondeat superior theory."  <u>Monell</u>

4  <u>v. Dep't of Soc. Servs. of NY</u>, 436 U.S. 658, 691 (1978).

5  Therefore, because no individual Sacramento police officer or

6  county employee is named as a defendant, these five claims must

7  fail as a matter of law.[12]   (<u>Id.</u>)

8        As per plaintiff's fourth cause of action, a municipal

9  body may, however, be sued under 42 U.S.C. § 1983, when "the

10  action that is alleged to be unconstitutional implements or

11  executes a policy statement, ordinance, regulation, or decision

12  officially adopted and promulgated by that body's officers."

13  <u>Monell</u>, 436 U.S. at 690.  In the alternative, the city may be

14  liable where the municipality's failure to train employees amounts

15  to "deliberate indifference" to the rights of persons with whom

16  the police come into contact.  <u>City of Canton v. Harris</u>, 489 U.S.

17  378, 388 (1989); <u>Alexander v. City and County of San Francisco</u>, 29

18

19  [11]   Although plaintiff named Police Chief Najera as a
defendant in his individual capacity, it is undisputed that

20  Najera was in no way directly involved with the apprehension and
arrest of decedent.  Sheriff Blanas and Chief Najera are also

21  both named as defendants in their individual capacities, but it
is clear that each of them is sued solely in his capacity as the

22  head of his respective department.  It is well established that
"an official-capacity suit is, in all respects other than name,
to be treated as a suit against the entity."  <u>Kentucky v. Graham</u>,

23  473 U.S. 159, 166 (1985).

24  [12]   Because this court denied plaintiff's motion to amend
the complaint, which sought to add Officers Bell and Nguyen, and

25  County Nurse Henry Carl, at oral argument and in her briefs,
plaintiff appears to concede that these five causes of action

26  must fail.  (Pl.'s Opp'n to County Defs.' Mot. for Summ. J. 1-2
n.2) ("As a result of the Court's ruling, plaintiff can no longer

27  maintain the first, second, third, fifth and sixth causes of
action in this matter, as each of these claims requires an

28  individual defendant to be maintained.").

16

1  F.3d 1355, 1367 (9th Cir. 1994).  A plaintiff bringing a <u>Monell</u>

2  claim must demonstrate both that a constitutional deprivation

3  occurred and that the municipality was the "moving force behind

4  the injury alleged."  <u>Id.</u> at 385; <u>Gibson v. U.S.</u>, 781 F.2d 1334,

5  1338 (9th Cir. 1986).

6          1.  <u>City Defendants' Motion</u>

7          Plaintiff's fourth cause of action, as alleged against

8  the City defendants, asserts that decedent's constitutional rights

9  were violated because: 1) the police officers failed to provide

10 adequate medical attention (by neglecting to immediately treat his

11 wounds, and by failing to later take him to a hospital); and 2)

12 Officer Bell cycled her taser a second time.  Plaintiff is of

13 course correct that a failure to provide adequate necessary

14 medical care to a prisoner <u>can</u> constitute actionable "deliberate

15 indifference."  <u>Carnell v. Grimm</u>, 74 F.3d 977, 979 (9th Cir.

16 1996).  However, other than mere assertion, plaintiff has not

17 offered <u>any</u> evidence that the officers' conduct in this case

18 constituted such a failure.

19         Indeed, as noted by City defendants, the videotape of

20 the incident clearly shows that soon after decedent was adequately

21 restrained, emergency medical personnel were brought in to treat

22 his self-inflicted wounds.  Moreover, plaintiff provides no

23 support, evidentiary or legal, for the assertion that, after being

24 cared for by the emergency medical personnel, decedent should have

25 nonetheless been taken to a hospital.  Overall, plaintiff has not

26 offered any evidence, in the form of expert testimony or

27 affidavit, to indicate that the officers' conduct was inadequate

28 or that any greater care could or should have been provided.

17

1    With regard to Officer Bell's second cycling of her
2  taser, the undisputed facts, as well as the video, confirm that
3  despite being shot with a taser once, decedent removed one of the
4  barbs and failed to adequately respond to the officers' commands
5  to get down on his stomach.  It was due to this failure that the
6  taser was cycled a second time.  Plaintiff bears the burden of
7  demonstrating that these actions nonetheless constitute a
8  violation of decedent's rights, and plaintiff has again failed to
9  proffer any evidence to this effect.  Plaintiff has not offered
10 any expert testimony, or even a single case, supporting the
11 assertion that Officer Bell's conduct was anything but reasonable.
12 See e.g. Michenfelder v. Sumner, 860 F.2d 328, 335 (9th Cir. 1988)
13 (upholding the constitutionality of the use of tasers, when they
14 are employed for a "reasonable security purpose").  Plaintiff
15 simply cannot rest solely on the allegations in the complaint.
16 Celotex, 477 U.S. at 323.  Thus, plaintiff has failed to
17 demonstrate that the officer's conduct constituted a
18 constitutional violation of decedent's rights.

19    Moreover, even assuming that an underlying
20 constitutional violation occurred, plaintiff has not shown that
21 any improper conduct on the part of the officers was the result of
22 a city policy or of the city's deliberate indifference towards the
23 rights of individuals.  City of Canton, 489 U.S. at 388.  Indeed,
24 plaintiff has not pointed to a single police policy regarding the
25 provision of medical care, or the proper use of tasers, that
26 plaintiff claims is improper.

27    The sole evidence plaintiff provides is in the form of
28 several depositions of the police officers' involved in the

18

1  incident, which serve to illustrate merely that these particular

2  officers did not receive training concerning: 1) administering

3  medical care to subjects who have received two short-duration

4  taser bursts; 2) "the use of tasers against subjects who may have

5  seizure disorders;" or 3) how to "communicate with subjects who

6  may be non-communicative." (Pl.'s Opp'n to City Defs.' Mot. for

7  Summ. J. 11.)  However, in <u>City of Canton</u> the Supreme Court

8  established, in no uncertain terms, that this sort of evidence is

9  <u>not</u> sufficient to support a claim under <u>Monell</u>.  489 U.S. at 390-

10  91.  As the court observed:

11          That a particular officer may be
        unsatisfactorily trained will not alone
12          suffice to fasten liability on the city, for
        the officer's shortcomings may have resulted
13          from factors other than a faulty training
        program. . . . It may be, for example, that an
14          otherwise sound program has occasionally been
        negligently administered.  Neither will it
15          suffice to prove that an injury or accident
        could have been avoided if an officer had had
16          better or more training, sufficient to equip
        him to avoid the particular injury-causing
17          conduct.
<u>Id.</u>
18
          Significantly, plaintiff fails to offer any evidentiary
19
support for <u>why</u> the existing procedures constitute a deliberate
20
indifference to individuals' rights.  Plaintiff has not provided
21
any evidence that city personnel knew these existing policies
22
represented a risk to suspects, nor has plaintiff shown that, had
23
such risks existed, they were nonetheless knowingly disregarded by
24
the city.  <u>City of Canton</u>, 489 U.S. at 389 ("Only where a
25
municipality's failure to train its employees in a relevant
26
respect evidences a 'deliberate indifference' to the rights of its
27
inhabitants can such a shortcoming be properly thought of as a
28

1 city 'policy or custom' that is actionable under § 1983.").

2 Simply put, plaintiff's showing, without more, cannot support the

3 existence of a well-established practice motivating alleged

4 constitutional deprivations by City police officers.  Monell, 436

5 U.S. at 694.  This court is bound by the standard in City of

6 Canton, and plaintiff has failed to offer any additional evidence

7 of a city policy exhibiting deliberate indifference towards the

8 rights of individuals.  Accordingly, the City defendants' motion

9 must be granted.

10          2.  County Defendants' Motion

11          Similar to her claim against the City, plaintiff's

12 fourth cause of action against the County alleges that the

13 County's policies resulted in decedent being deprived of his

14 medications from the time he was brought to the jail

15 (approximately 1:00 p.m. on December 22, 2004) until the time of

16 his death (approximately 10:00 a.m. on December 23, 2004), thereby

17 representing an unconstitutional deprivation of medical care.

18 (Pl.'s Opp'n to County Defs.' Mot. for Summ. J. 12-14.)  As noted

19 above, prisoners do indeed have a right to receive adequate

20 medical care while in custody, in so far as prison officials are

21 not "deliberately indifferent to serious medical needs."  See

22 Carnell, 74 F.3d at 979; City of Revere v. Mass. Gen. Hosp., 463

23 U.S. 239, 244 (1983).

24          However, plaintiff has again failed to submit any

25 evidence indicative of the "deliberate indifference" purportedly

26 exhibited by the County's policies.  City of Canton, 489 U.S. at

27 389.  By contrast, in this case, the undisputed facts demonstrate

28 County policies characterized by a constant level of attention to

1   the evaluation and care of the prisoners.  In this case, decedent

2   was brought in to the County jail in the afternoon of December 22,

3   2004, and, pursuant to County policy, evaluated by a registered

4   nurse, Mr. Carl.  Carl's physical examination found all of

5   decedent's vital signs to be normal, and properly referred him to

6   JPS for psychiatric evaluation based on his history.  JPS

7   evaluated decedent, again taking his vital signs, and determined

8   that because he was significantly mentally-disabled, a 72-hour

9   hold was warranted under Section 5150.  Decedent was thus admitted

10  into the in-patient psychiatric unit, where he was observed

11  regularly throughout the night.  At all times, decedent was under

12  constant supervision, and subjected to repeated mental and

13  physical evaluations prior to his scheduled complete psychiatric

14  examination.  It is difficult to conceive, and indeed plaintiff

15  does not suggest, what more could have been done.

16          Moreover, the Ninth Circuit has held that courts "must

17  apply a deferential standard of review to challenges regarding

18  prison regulations and uphold the regulation 'if it is reasonably

19  related to legitimate penological interests.'"  Mauro v. Arpaio,

20  188 F.3d 1054, 1058 (1999) (citing Turner v. Safley, 482 U.S. 78,

21  84 (1987)).  Plaintiff primarily takes issue with the fact that

22  decedent was not provided his medications quickly, upon arrival at

23  the jail.  However, at oral argument plaintiff's counsel conceded

24  that there is no evidence that anyone, including Heritage Oaks

25  employees, City of Sacramento police officers, and County

26  employees, had either a copy of decedent's prescriptions or the

27  actual medicine he was to take.

28  ///

1    Although Mr. Carl was provided with a handwritten list
2  of decedent's medications, without any physician verification of
3  the prescriptions and/or decedent's medical records, there was no
4  way for him to verify the accuracy of the information provided.[13]
5  This problem was further compounded by decedent's failure to
6  communicate.  Only after a determination has been made that
7  psychiatric admission is proper, and a patient has subsequently
8  been evaluated by a trained psychiatrist, can the appropriateness
9  of administering medication be assessed.  As shown by the
10  undisputed facts, the County's policies provide for just such a
11  psychiatric evaluation, within 24 hours of admission.

12    Plaintiff has provided no support, either evidentiary or
13  by analogy to relevant case law, for the notion that this level of
14  care provided by the County was constitutionally inadequate.
15  Moreover, plaintiff has again failed to provide any evidence that
16  any County employee was aware that the existing policies
17  represented any appreciable risk to prisoners, and deliberately
18  proceeded in the face of this risk.  Because mere allegations are
19  not sufficient to survive a motion for summary judgment, County
20  defendants' motion must be granted.  <u>Celotex</u>, 477 U.S. at 323.

21    IT IS THEREFORE ORDERED that:

22    (1) Heritage Oaks' motion for summary judgment be, and
23  the same hereby is, GRANTED;

24    (2) City of Sacramento and Albert Najera's motion for
25  summary judgment be, and the same hereby is, GRANTED;

26

27    [13]    The court also notes that registered nurses are
    prohibited from prescribing medication.  Cal. Health & Safety
28  Code § 11150 <u>et</u> <u>seq.</u>.

22

1          (3) Sacramento County and Lou Blanas' motion for summary

2 judgment be, and the same hereby is, GRANTED.

3 DATED:   January 25, 2007

4

5                                    _____

6                                    WILLIAM B. SHUBB
                                     UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23